

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| PAMELA R. KANNAS | * | CIV. 09-4149 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| | * | |
| | * | |
| MICHAEL J. ASTRUE, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on November 8, 2004[1], and payment of disability insurance and medical benefits under Title II of the Social Security Act.[2] The Plaintiff has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively,

---

[1]As noted in the Commissioner's brief, the Plaintiff filed a previous application for Title II/DIB benefits. Plaintiff's previously applied in 2001. All claims were denied initially and on reconsideration (AR 8). The 2001 claim was denied by an Administrative Law Judge on April 8, 2003. The Appeals Council subsequently denied review and Plaintiff did not pursue a judicial appeal. Thus, Plaintiff's disability status has been conclusively adjudicated through April 8, 2003 (the date of the ALJ determination on her 2001 claim, which became final when she did not appeal). While none of the historical administrative records are contained in this transcript, some of Plaintiff's medical records which pre-date her current claim for benefits are included.

[2]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status (calculated according to her earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed her application for SSD/DIB benefits only. She filed her application on April 4, 2007. AR 77-84.   Mrs. Kannas's "date last insured" for SSD/DIB ("Title II") benefits is December 31, 2008. *See* AR 8, 86.

the Plaintiff requests a remand to the agency pursuant to 42 U.S.C. § 405(g) sentence four, for further consideration. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for further proceedings.

### JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

### ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for benefits on April 4, 2007. AR 77-84. In a form entitled "Disability Report–Adult" she filed in connection with her 2007 disability application (AR 105-112) Plaintiff listed the following as illnesses, injuries or conditions that limited her ability to work: "stomach ulcer, blood clots, arthritis–hip dysplasia, carpel tennel (sic) poor circulation in legs, cellulitis, herniated disc, acid reflec (sic) sluggish thyroid, insulin resistant, hearing loss" AR 106. She explained that these conditions limit her ability to work in the following ways: "It is very hard for me to move or sit or stand for a long time. I have to be able to move every so often so that I can get thru the pain. I need to have hip replacement in the right hip but have no insurance to do this–I cannot get treatment for a lot of my problems because I have not (sic) health insurance." *Id.*

Plaintiff's current claim was denied initially on July 20, 2007 (AR 46), and on reconsideration on October 22, 2007 (AR 47). She requested a hearing (AR 57) and a hearing was held by video conference on January 14, 2009, before Administrative Law Judge (ALJ) the Honorable Christopher Messina. AR 19-45. On April 9, 2009, the ALJ issued an eleven page, single-spaced decision affirming the previous denials. AR 8-18. On May 9, 2005, Plaintiff's

attorney[3] sent a "Request for Review of Hearing Decision/Order" to the Appeals Council requesting review of the ALJ's decision. AR 147 The Appeals Council received as additional evidence a letter from Plaintiff's attorney (AR 4, 145-46) but nonetheless denied review of Plaintiff's claim on September 21, 2009. AR 4. Plaintiff then timely filed her Complaint in the District Court .

## FACTUAL BACKGROUND

Pamela Kannas was born in 1957 and was fifty-one years old at the time of the administrative hearing. AR 23, 77.[4] She is a high school graduate. AR 25. She does not have any post-secondary education. AR 111. Her past job experience includes working as a "very part-time cook" at a grade school and as a caretaker for elderly people. AR 107. The ALJ found that the cook position qualified as past relevant work. AR 16. Claimant's documentation and her earnings history show, however, that during the time Claimant worked as a cafeteria cook she never earned enough for the cook job to qualify as past relevant work.[5] The ALJ found that Plaintiff never earned enough at the caretaker position to amount to substantial, gainful employment, so it did not qualify as past relevant work. The Plaintiff did not, therefore, have any past relevant work. At the time of the hearing, she worked ten hours per week (two hours per day) as a seamstress, mending and altering clothes for a dry cleaner. AR 25.

---

[3]Plaintiff was not represented by Mr. Pfeiffer at the administrative level.

[4]Pursuant to 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(g), Plaintiff was "approaching advanced age" (50-54) on the date of her administrative hearing and on her date last insured. On the date of her alleged onset, she was a "younger individual" (45-49). *Id.* at § 201.00(h)(1).

[5]Plaintiff's earning record printout is located at AR 89-100. Although the printout is difficult to decipher, the only records which appear to represent payment from a school (and could therefore be payment for the "very part time" school cook job) are from the Waverly School District, and are in the amount of $91.42 and $47.09. Past work activity does not qualify as past relevant work unless it was substantial gainful activity. 20 C.F.R. § 404.1560(b). The monthly earning amount required to establish substantial gainful activity is calculated according to 20 C.F.R. § 404.1574(b)(2)(B). For 2004, the monthly amount was $804.00. *See* www.ssa.gov.oact/cola.sga Plaintiff's school cook job, therefore, did not rise to the level of substantial gainful activity and was likewise not past relevant work.

Plaintiff asserts she became disabled in November, 2004.   She worked full-time "on and off" as a home-health aide from 2004-2006[6] but  when her last client went into assisted living in April, 2007, Plaintiff filed for DIB benefits because she did "not feel [she could] do any other types of work because of all [her] health problems." AR 79.

**Medical Conditions and Treatment**

The medical records which appear in the administrative records are summarized by provider.

1.    **Brown Clinic, Watertown, South Dakota 9/03 through 11/04**

Plaintiff treated at the Brown Clinic in Watertown for routine gynecological screening in the fall of 2003 and 2004. The results were benign. AR 152-60. During the course of her 2003 annual exam with Dr. Flaherty, Plaintiff mentioned she'd had one hip replaced and believed she would need to have the other replaced as well. AR 151. She also mentioned her chronic hip pain. *Id.* Plaintiff's gynecologic exam was normal, but Dr. Flaherty noted Plaintiff would benefit from a weight loss program.  *Id.*  She treated  with Dr. Flaherty for  perimenopausal changes in the summer of 2004. AR 150.

2.    **Sioux Valley Clinic, n/k/a Sanford Clinic, Watertown, South Dakota 9/00 through 12/08**

Plaintiff visited the Sioux Valley Clinic in September, 2000, complaining of bilateral heel pain. AR 177. She also reported hip degeneration, having already had a left hip replacement. She complained of low back pain.  She possessed orthotics for her shoes, but had not used them regularly.  She'd recently begun to use them again in an attempt to alleviate the heel pain.  She had

---

[6]Plaintiff's earnings history indicates she earned nothing in 2001 or 2002.  She earned:

| | |
|---|---|
| $   91.00 | in 2003 |
| $9,548.00 | in 2004 |
| $2,949.00 | in 2005 |
| $7,444.00 | in 2006 |
| $1,760.00 | in 2007 |

4

also tried many over the counter medications and shoe inserts. AR 177. She reported ability to stand for only about one-half hour before having to sit down. *Id.* The physician diagnosed plantar fasciitis and over pronation syndrome. He prescribed medication and arch supports.

Plaintiff sought evaluation for polycystic ovary disease (PCOS) on March 8, 2005. AR 176. Her physician noted Plaintiff was very defensive and limited in her conversation during the office visit. *Id.* She complained of excessive hair on her upper lip, chin, and arms. She also described progressive weight gain but was "offended" by the idea of a specific weight loss program. Dr. Benson deferred a physical exam but spent time counseling her. AR 175. He diagnosed menstrual dysfunction and infrequent menstruation as well as excessive facial and body hair (hirsutism), most likely related to polycystic ovarian disease. AR 175. He noted "she at this point has no insurance and no coverage for labs, etc. and so would like to keep this to a minimum." *Id.* Dr. Benson prescribed Metformin.[7]

Plaintiff returned in April, 2005 for follow up with Dr. Benson. AR 174. Her lab work was normal. She was tolerating the Metformin well. Dr. Benson explained that solving the excess body hair would be a long-term issue. He suggested Yasmin[8] to assist with this problem. *Id.* Plaintiff explained cost was a big issue and she could not afford Yasmin and Metformin. Dr. Benson suggested waiting a few months, then converting to Yasmin if the Metformin was not working by then. *Id.*

Plaintiff saw Dr. Johnson on December 30, 2005. She reported lower left leg pain that started the previous Saturday night. AR 172. Plaintiff's left leg was red, painful and swollen. *Id.* She had sustained no injury, but had a history of pain and swelling in her leg on and off for quite a while. AR

---

[7]Metformin is the generic name for Glucuvance. Glucovance is an oral antihyperglycemic, used for the management of Type 2 diabetes. Www.rxlist.com

[8]Yasmin is an oral contraceptive. Www.rxlist.com

172. Dr. Johnson noted Plaintiff had a saphenous[9] vein cut down as a child and continued to have problems with her leg "all the time" since then.  *Id.*   She also noted problems with stasis dermatitis.[10]  Dr. Johnson's exam revealed Plaintiff's left leg was swollen and red.  The leg was warm to the touch and "obvious cellulitis." Dr. Johnson also diagnosed superficial thrombophlebitis (a swelling caused by a blood clot near the surface of the skin).  He injected Rocephin[11] and prescribed Augmentin.[12]  Dr. Johnson instructed Plaintiff to elevate her leg and use hot packs.  AR 172.

Plaintiff saw a physician's assistant on December 31, 2005 for a recheck of her cellulitis. AR 173.  She had seen Dr. Johnson the day before.   The physician's assistant noted improvement. Plaintiff's inner left leg was not as bright red.  AR 173.  She received another Rocephin injection. She continued her Augmentin and was instructed to return for follow up with Dr. Johnson the following week.  *Id.*

Dr. Johnson examined Plaintiff on January 4, 2006.  AR 171.  The pain, swelling and redness were all improved but still present.  *Id.*  Plaintiff did, however have a rash on her left leg.  Dr. Johnson incised a sebaceous cyst which was non-productive.  *Id.*  He instructed her to continue the Augmentin and change the dressings on her leg several times per day.  *Id.*   By January 12, 2006, Plaintiff reported her leg pain "markedly improved."  AR 168.  The swelling and redness had also

---

[9]The saphenous vein is a large vein in the leg which begins at the toes and runs the length of the leg, into the groin. Www.medterms.com

[10]Dermatitis is characterized by red, itchy skin, although acute attacks may result in crusty scales or blisters that ooze fluid.  Www.webmd.com.  Stasis dermatitis is caused by poor circulation and can happen in people with varicose veins, congestive heart failure, or other conditions which result in chronic leg swelling.  *Id.*

[11]Rocephin is a broad spectrum intravenous antibiotic indicated for the treatment of various infections, including skin and skin structure infections.  Www.rxlist.com.

[12]Augmentin is an oral antibacterial indicated for the treatment of various infections, including skin infections.  Www.rxlist.com.

improved. *Id.*   She continued, however to have "very indurated,[13] discolored skin consistent with stasis dermatitis and cellulitis." AR 168. Dr. Johnson instructed Plaintiff to wear compression stockings whenever possible and to keep her leg elevated "whenever possible." *Id.*

Plaintiff saw Dr. Benson for gynecological concerns in February, 2006. AR 167.   She reported the Metformin was not helping her symptoms of excessive hair growth, but her menstrual cycle had become more regular. *Id.* Plaintiff continued to struggle with being overweight but did not want to take time to engage in a formal program. *Id.*   She told Dr. Benson she had no insurance or money. *Id.*   Electrolysis had been helping somewhat, but Plaintiff had resorted to shaving her arms. She did not want to spend a lot of money on lab work to evaluate her hyperandrogenism.[14] Dr. Benson noted chronic venous changes of both lower extremities but no active ulcers. AR 169. He recommended a weight loss program (Weight Watchers, TOPS, or Optifast). Plaintiff expressed reluctance to try any of them, but Dr. Benson stressed doing nothing was not an option. *Id.*   Plaintiff agreed to switch from Metformin to Yasmin, but stopped after about 45 days when she developed blood clots. AR 170.

In April 2006, Plaintiff saw Dr. Johnson regarding right hip pain and back pain. AR 165. She also complained of symptoms she related to acid reflux, but refused an EGD or a referral to an orthopedic physician for evaluation of her hip and back symptoms because she had no insurance. *Id.*   Dr. Johnson noted she was palpably tender in her low back, but nothing severe. *Id.*   Her reflexes at the knee and ankle were equal, and her motor sensation was normal. *Id.*   Dr. Johnson prescribed

---

[13]Indurated is hardened, usually used with reference to soft tissues becoming extremely firm or hard.  STEADMAN'S MEDICAL DICTIONARY (26th Ed. 1995), p. 866.

[14]Hyperandrogenism is a state caused by excessive secretion of androgens by the adrenal cortex, ovaries, or testes. The . . . term is used most commonly in reference to the female.  The common manifestations in women are hirsutism [excessive hair] and virilism. Hyperandrogenism is often caused by either ovarian or adrenal diseases.  Www.medical-dictionary.thefreedictionary.com

Protonix[15] (free samples) and Mobic.[16] Dr. Johnson noted "I do think we need to do some further evaluation but again, finances are the limiting factor in this situation." AR 165.

Plaintiff saw Dr. Benson in February 2007 for her annual exam. AR 163. Plaintiff's exam was normal but she reported feeling fatigued. Dr. Benson ordered a blood panel to check for hypothyroidism and impaired glucose tolerance. AR 164. She refused a bone density test and colonoscopy. Id.

In March, 2007, Plaintiff reported to Dr. Johnson that for several weeks she had been experiencing an intermittently racing heart. AR 162. She also a painful, open area on her left lower leg that burned and itched. Id. Dr. Johnson noted her blood pressure was elevated and she appeared quite anxious. He observed redness on her lower left leg consistent with cellulitis which had broken down, and some stasis dermatitis. Id. An EKG showed occasional PVCs and some inverted T waves. Dr. Johnson recommended that Plaintiff wear a Holter monitor but Plaintiff declined for financial reasons. AR 162. Dr. Johnson obtained a chest x-ray which was negative. Id. Dr. Johnson believed Plaintiff's palpitations were caused by anxiety more than anything, so he prescribed Xanax.[17] For the leg infection, Dr. Johnson prescribed Keflex[18] and Triamcinolone Cream.[19]

Plaintiff returned to see Dr. Johnson on April 20, 2007. She had redness on the left side of

---

[15]Protonix is a compound that inhibits gastric acid secretion. It is indicated for the short-term treatment of erosive esophagitis. Www.rxlist.com.

[16]Mobic is a non-steroidal anti-inflammatory indicated for the signs and symptoms of osteoarthritis. Www.rxlist.com.

[17]Xanax is a benzodiazepine compound, indicated for the management of the short-term relief of symptoms of anxiety. Www.rxlist.com.

[18]Keflex is a semi-synthetic antibiotic intended for oral administration. It is indicated for the treatment of several types of infections, including skin infections. Www.rxlist.com.

[19]Triamciniolone Cream is a topical corticosteroid. It is indicated for the relief of inflammatory and pruritic dermatoses. Www.rxlist.com.

her neck which extended down to the left side of her shoulder onto her left anterior chest. The area was warm and itchy. AR 210. Plaintiff also complained of open sores on her lower left leg. *Id.* Dr. Johnson noted Plaintiff had severe venous insufficiency, severe varicosities, and poor wound healing on the lower left leg. His exam revealed erythema on the left neck, left anterior chest, and left shoulder, consistent with cellulitis. Her left lower leg had indurated skin, erythema, and four open wounds. AR 210. Dr. Johnson prescribed Augmentin and antibacterial cream. *Id.* He also ordered a blood panel to check Plaintiff's thyroid levels. *Id.*

When Plaintiff returned for a re-check in May, 2007, her cellulitis was worse. AR 209. Her rash had spread, and Plaintiff indicated the only place on her body that did not itch was the bottom of her feet. *Id.* Dr. Johnson opined Plaintiff may be having some sort of allergic reaction. He prescribed steroids and antibiotic cream. *Id.* Two days later, Plaintiff returned much improved. AR 208. The redness and itching were decreasing. *Id.*

In June, 2007 Plaintiff saw Dr. Johnson, again complaining of itching on her neck and her groin area. AR 205. She explained she believed she needed a right hip replacement as a result of bilateral hip dysplasia that was not properly treated as a child. *Id.* Plaintiff was distraught and crying when Dr. Johnson entered the exam room. *Id.* He opined she may be depressed. *Id.* Plaintiff deferred getting a right hip x-ray until she knew whether she would be covered by disability. AR 206. Dr. Johnson prescribed Allegra[20] to help with the itching, and indicated he would prefer to avoid further steroids.

On August 6, 2007, there is a note in the medical record that a refill of hydrocodone[21] was given. It is does appear Plaintiff was seen in the office on this date. Further refills were denied, however, on August 24 and 27, 2007. AR 216.

---

[20]Allegra is a histamine receptor antagonist. It is indicated for the symptoms of uncomplicated skin manifestations of chronic idiopathic urticaria (hives). Www.rxlist.com.

[21]Hydrocodone is an opioid analgesic. It is indicated for the relief of moderate to moderately severe pain. Www.rxlist.com.

On August 29, 2007, Plaintiff reported to Dr. Johnson that she had "pain all over." AR 215. She specifically complained of pain across her shoulders, into her back and down her arms. *Id.* She was fatigued. She was not sleeping well and her joints hurt. She indicated these symptoms had been "going on for months." Dr. Johnson's exam revealed elevated blood pressure, but her neurological exam was grossly intact. X-rays of Plaintiff's hips and lumbosacral spine demonstrated "mild osteoarthritic change." AR 215.[22] Dr. Johnson gave Plaintiff free samples of Ultram.[23]

There is another note in the record, handwritten on a lab report (AR 221) which asks "did the Ultram help? no." Followed by an instruction to call in an order for Vicodin on 9/12/07. There is another handwritten note on a lab report (AR 220) to call in a prescription for Biaxin[24] on September 6, 2007.

Dr. Johnson's note for January, 2008 (AR 237) indicates Plaintiff was in the office in November, 2007, but the record does not contain an office note from November, 2007. Dr. Johnson indicates he started Plaintiff on Cymbalta[25] for her neck pain. Dr. Johnson's impression of Plaintiff's condition was chronic pain syndrome and hypothyroidism. *Id.* He gave her six weeks' worth of Cymbalta samples. He also increased her Hydrocodone dose, and indicated she should see a rheumatologist by the end of the month. In March and April, 2008, Dr. Johnson called Cymbalta refills in to the pharmacy, but it does not appear Plaintiff was seen in the office. AR 236. In June, 2008, again it appears prescriptions were called in to the pharmacy but Plaintiff was not seen in the

---

[22]The radiologist's report of the x-rays taken on August 29, 2007 is found at AR 217. The radiologist reported moderate disc narrowing in the cervical spine, mild disc narrowing at the L2-3, and the L4-5, but severe disc narrowing at the L5-S1 with disc collapse.

[23]Ultram is a centrally acting analgesic indicated for the management of moderate to moderately severe pain in adults. Www.rxlist.com.

[24]Biaxin is an antibiotic indicated to treat several types of infections, including skin infections. Www.rxlist.com.

[25]Cymbalta is a selective serotonin and norepinephrine reuptake inhibitor. It is indicated for several uses, including major depressive disorder, fibromyalgia, and chronic musculoskeletal pain. Www.rxlist.com.

office. AR 235. In September, 2008, Dr. Johnson's office note indicates Plaintiff called indicating she believed she had cellulitis again, but refused to be seen at the office. Dr. Johnson called in a prescription for Keflex at Plaintiff's request. AR 234.

In October, 2008, Plaintiff returned to Dr. Johnson's office with multiple concerns. AR 232. She reported "just not feeling well at all." *Id.* She felt shaky and anxious in addition to her repeated episode of left leg cellulitis. Dr. Johnson's physical exam revealed left lower extremity which was indurated, red, and had open, weeping sores. AR 232. Dr. Johnson's impression was left leg cellulitis, fatigue, chronic pain, generalized pruritus, and hypothyroidism. He recommended an Unna boot[26], but Plaintiff refused it. Dr. Johnson recommended an evaluation by the wound clinic for Plaintiff's left leg because it was a chronic issue for her. AR 232. He again prescribed Keflex and an antibiotic cream.

In December, 2008, Plaintiff again called Dr. Johnson's office requesting assistance with obtaining prescription medication without an office visit. AR 231. She had been obtaining Cymbalta directly from the pharmaceutical company, but the company was requesting the physician's office to complete some paperwork in order to continue with the program. *Id.* At the end of December, 2008, Dr. Johnson's records indicate he gave Plaintiff free samples to hold her over until her medication arrived in the mail. AR 229.

Dr. Johnson completed a questionnaire on December 22, 2008 at the request of Plaintiff's counsel. AR 227-28. He opined Plaintiff's symptoms would interfere with her attention and concentration occasionally. AR 227. He estimated she could sit for 30 minutes before having to change positions. *Id.* He estimated she could stand for 30 minutes before having to sit down. *Id.* He limited her ability to sit to 4 hours out of an 8 hour work day. *Id.* He also limited her ability to stand to 4 hours out of an 8 hour work day. AR 228. Finally, he limited her ability to carry to 10

---

[26]An Unna boot is a compression dressing consisting of a paste, primarily made of zinc oxide, that is applied both under and over a gauze bandage, used on the lower leg for venous ulcers, phelbitis, sprains and other disorders. Http://medical-dictionary.thefreedictionary.com.

pounds on an occasional basis.  AR 228.

### 3.    Health First Chiropractic, Mike Hendricks, D.C, 9/07

The record contains only a letter from Dr. Hendricks.  It indicates Dr. Hendricks treated Plaintiff for mid and low-back pain with radiation down the right leg. AR 224.  She also reported left upper back and shoulder pain with radiation to the lower neck and into the left arm. *Id.* Plaintiff indicated these symptoms had been present for many years.  She reported poor sleep.  She also reported right hip pain.  Dr. Hendricks' exam revealed muscle spasm and spinal restrictions in the cervical, thoracic, and lumbar spine.  Movement and range of motion were limited by pain.  X-ray showed diminished lordotic curves, degenerative disc disease and joint disease and spurring in the lower cervical and lumbar spine.  AR 224.  X-rays also showed AP lumbar scoliosis and spondylolisthesis at L4.  Dr. Hendricks treated Plaintiff with spinal mobilization, soft tissue mobilization, and electrical muscle stimulation.  He also taught her home exercises and stretches. Dr. Hendricks reported that Plaintiff responded "slowly but positively" to his treatment.  He predicted she "may continued to experience aggravations . . . which may limit  her from doing normal activities of daily living." AR 224.

### 4.    South Dakota Disability Determination Services Consultative Exam: Dr. Dan Reiffenberger, M.D. 6/26/07

Dr. Dan Reiffenberger examined Plaintiff at the request of South Dakota Disability Determination Services.  He noted Plaintiff had a hip replacement "within the last 10 years." AR 189.[27] Dr. Reiffenberger noted Plaintiff's acid reflux problems. This affected her mostly in relation to her ability to tolerate pain medication. *Id.* He noted Plaintiff's hearing loss, left greater than right. He indicated she'd never been told she needed hearing aids, but she knew she needed to do something about her hearing.  Dr. Reiffenberger did not notice Plaintiff had any problem understanding him during his examination. AR 189.

---

[27]Dr. Reiffenberger's notes indicate he took an oral history from Plaintiff, but do not indicate that he reviewed Plaintiff's previous medical records.

Dr. Reiffenberger noted Plaintiff's history of blood clots (superficial thrombophlebitis). AR 189. He also noted her problems with recurrent cellulitis and venous stasis changes in both legs, left worse than right. She had never had a blood clot requiring Coumadin or blood thinners. He also noted her hypothyroidism with symptoms of fatigue which had improved since starting medication. AR 189. Plaintiff recounted her history of deteriorating hip dysplasia and her inability to afford treatment for her right hip. *Id.* Plaintiff's history also included bilateral carpal tunnel surgery; multiple times on the left. She did not wear splints but indicated a need to be cautious with the use of her hands. AR 190.

Plaintiff also recounted chronic back pain which she attributed to disc problems, arthritis, and her hip dysplasia . *Id.* She explained to Dr. Reiffenberger that she had seen a chiropractor but her lack of insurance prevented her from exploring other options. AR 190.

Dr. Reiffenberger's exam revealed Plaintiff was 5'4" and 215 pounds. Her grip was "a little diminished" bilaterally but no gross deformities were noted. AR 191. She had a full range of motion in her upper extremities. *Id.* Dr. Reiffenberger noted a lot of venous stasis changes in the left lower extremity, but no ulcerations and no edema. Reflexes were normal. Straight leg raise was limited on both sides. AR 191.

X-rays of Plaintiff's lumbar spine and right hip were taken at Dr. Reiffenberger's request. AR 193. The lumbar spine showed a narrowed L5-S1 disc space and minimal spondylolisthesis of the L4 on 5. It also showed an orthopedic hip device anchored with several screws. AR 193. The radiologist's general impression was degenerative disc disease at the L4-5. The right hip showed minimal degenerative changes, within normal limits for Plaintiff's age. *Id.*

Dr. Reiffenberger assessed the following conditions: chronic back pain, subjective hearing loss, superficial thrombophlebitis with history of venous stasis changes, hypothyroidism, history of bilateral carpal tunnel, history of mild GE reflux, and chronic hip pain with history of left hip replacement. AR 191. Based on his examination he predicted Plaintiff would have difficulty with

13

lifting and carrying because of her carpal tunnel history and limited grip strength.   He did not, however, place specific restrictions.  AR 192.  He did not place any restrictions on sitting, standing or walking.  *Id.*  He predicted difficulty stooping and climbing because of Plaintiff's back problems, but he did not place specific restrictions.  *Id.*  Dr. Reiffenberger did not place any restrictions on seeing, speaking or traveling.  He acknowledged he'd not seen her audiology exam, but indicated she heard and understood him during her exam.  He imposed no environmental limitations.  Dr. Reiffenberger recommended Plaintiff obtain physical therapy and an orthopaedic evaluation.  AR 192.

### 5.    Residual Functional Capacity Assessment, Non-Treating, Non-Examining Physician (Dr. Frederick Entwistle 7/20/07, Dr. Kevin Whittle, 10/20/07))

Dr. Frederick Entwistle completed a Residual Functional Capacity Assessment on July 20, 2007.  He did not examine or treat the Plaintiff.  AR 195-202.  The only medical records Dr. Entwistle indicated he reviewed were Dr. Reiffenberger's consultative exam which occurred one month before the FCA.  Dr. Entwistle opined Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently.  He indicated she could stand/walk 6 hours out of an 8 hour work day.  He indicated she could sit about 6 hours out of an 8 hour work day, and that her operation of hand/foot controls was limited in the upper extremities by her diminished grip bilaterally.  AR 196.  In the narrative portion of his report, Dr. Entwistle noted Plaintiff has

> full ROM of the upper extremities.  Lower extremities show allot (sic) of venous stasis but no ulceration.  She has no edema.  Pulses are 2/4 bilaterally Reflexes are normal to about 60 degrees and then se statesd (sic) it pulls to (sic) much on her back.  She can raise her right leg to 45 degrees before it starts pulling.  She can get up on her heels and does without difficultly (sic).  Her cranial nerves are intact

AR 196.  Dr. Entwistle opined Plaintiff could climb ramps, stairs, ladders, ropes and scaffolds occasionally.  AR 197.  She could also balance, stoop, kneel, crouch, and crawl occasionally.  *Id.*  Because of the limited grip strength caused by her carpel tunnel, Dr. Entwistle limited Plaintiff's fine manipulation to occasional but otherwise did not restrict her manipulative skills.  AR 198.  He did not assign any visual or communicative limitations.  AR 198-99.  He indicated Plaintiff should avoid concentrated exposure to extreme cold or heat, but otherwise did not assign any environmental limitations. AR 199.  Dr. Entwistle acknowledged Plaintiff had "some stasis dermatitis–a medically

14

determinable impairmnet." (sic). AR 200. On October 20, 2007, Dr. Kevin Whittle after reviewing "all the evidence in the file" affirmed Dr. Entwistle's assessment. AR 226.

### Hearing Testimony

Plaintiff and a vocational expert (Richard Ostrander)testified at the administrative hearing which was held by video conference on January 14, 2009. Plaintiff was fifty-one years old on the day of the hearing. AR 23. She was married and had one adult child. *Id.* She is a right-handed person. AR 24. She arrived at the hearing walking with the assistance of a cane. She explained she uses the cane "off and on" to help balance because of her hip pain. *Id.* She estimated she uses the cane ten days out of the month. Her doctor prescribed the cane when she had her left hip replaced in 1996. *Id.*

Plaintiff completed high school and does not have any difficulty reading or writing. AR 25. She has no problems doing basic math or managing her own money. *Id.* She was then working for a dry cleaning business as a seamstress ten hours per week, two hours per day. *Id.* She began that employment in March, 2008. She worked full-time "on and off" from 2004-2006 as a home health aide. Her clients either passed away or went into assisted living. AR 26. She filed a worker's compensation claim once when she had her carpal tunnel surgeries. AR 26-27.

Plaintiff described the physical problems which she believes prevent her from being able to work as follows: hip problems which are deteriorating, back pain, and knee pain (AR 27-28). She also described arthritis which causes her hands and shoulders to ache. AR 31. She said her left hip had been "good" since her replacement surgery. *Id.* She was currently taking prescription medication Hydrocodone and Cymbalta. AR 32. They helped "ease the pain up" but not take it away. *Id.* On occasion when she hurt "real bad" she would take a pill and a half. *Id.* Walking, lifting and standing increased her pain. *Id.* She estimated she could walk about a block before her pain would increase. AR 33. She estimated she could lift 20 or 25 pounds. Standing is "very hard" for her. She indicated standing is the most difficult. *Id.* She said she does not have a problem

15

sitting[28] or grasping objects, but she just has an ache in her hands all the time. *Id.*

Plaintiff explained she does not hear well. AR 34. She had a hearing test the year before the administrative hearing. *Id.* Her left ear is worse than her right. *Id.* She did not have any problem hearing the ALJ during the video conference. She has problems hearing if people are turned away from her. *Id.* She did not notice any side effects from her medication. AR 34. [29]

She is able to cook and clean the house. AR 35. Her husband does a lot of the cooking, too. *Id.* When she cleans, it just takes her a long time to get it done. *Id.* A lot of the things she does around the house she can do, but she "hurts really bad" afterwards. *Id.* She is able to drive. *Id.* She is a crafter and she likes to sew. AR 36. She explained that her job at the dry cleaners allows her to be "up and down all the time." AR 38.

### Vocational Testimony

Rick Ostrander testified as a vocational expert (VE). AR 39. He completed a past relevant work summary (AR 144) which indicated Plaintiff's past relevant work consisted of a home attendant (semi-skilled medium duty work) and a school cafeteria cook (skilled, medium duty work). The ALJ asked the VE four hypothetical questions. The first hypothetical question asked the VE to assume a person of Plaintiff's age, education and work experience who could lift up to 20 pounds occasionally, 10 pounds frequently, stand/walk 6 hours out of an 8 hour day, sit 2 hours out of an 8 hour day, occasionally operate foot controls, never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, and occasionally balance with a handheld device, occasionally stoop, crouch,

---

[28]On cross examination she clarified that she can sit better than she can stand or walk. AR 36. She explained she can sit but does need to get up and move around. She estimated she could sit for about 15 minutes before she would need to get up and move around a little bit. *Id.* She did not know how long she could spend sitting out of an 8 hour work day. AR 37.

[29]Again on cross examination, Plaintiff explained she usually sleeps for three hours each afternoon. "Well, I sit. You know, get up and do things, and I always sleep in the afternoon, and if there's no one around, it's like I'll sleep for three hours, not that I want to. It's just that I can't wake up, and I'm assuming that's from the pain meds." AR 37.

kneel, and crawl. The ALJ instructed the VE to assume Plaintiff's past work as a caretaker was not past relevant work because it did not amount to substantial gainful employment. AR 40. Given that hypothetical, the VE explained Plaintiff would be limited to light duty work with additional limitations of occasional stooping, kneeling, crouching, crawling, and balancing. AR 40-41. Examples of jobs fitting within those limitations are tanning salon attendant (300-500 openings in the region) storage facility rental clerk (1000 openings in the region) and survey worker (500 openings in the region). AR 41.

The second hypothetical asked the VE to assume the same limitations as the first hypothetical except added the additional requirement of "frequent fingering." AR 41. The VE indicated his answer would be the same as to the first hypothetical. *Id.* The third hypothetical limited fingering to "occasional." AR 42. If fingering was limited to occasional, the survey worker position would be eliminated. *Id.* The fourth hypothetical limited crouching, kneeling and crawling to "never." With the addition of those limitations, all of the jobs except the survey worker would be eliminated. AR 43. But the survey worker position requires more than occasional fingering. *Id.*

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf,* 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial

17

evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

## B.    The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d

1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant  is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R.  § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and  the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW) as defined by 20 CFR 404.1560(b)(1).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§  404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

### C.    Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.    The ALJ's Decision

The ALJ issued an eleven page, single-spaced decision on April 9, 2009. The ALJ's decision discussed steps one through five of the above five-step procedure.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged onset date (November 8, 2004) through her date last insured (December 31, 2008). AR 10.

At step two, the ALJ found that through her date last insured, the Plaintiff had the following severe impairments: mild osteoarthritis in the lumbar spine; osteoarthritis of the right hip; left hip status post hip replacement in 1996; bilateral carpal tunnel syndrome; and obesity. AR 10.    The ALJ found that Plaintiff's hirsutism, cellulitis, and superficial thrombophlebitis were all non-severe impairments.  Because these were non-severe impairments, the ALJ indicated they "will not be considered in the remainder of this decision." AR 10-11.

At step three, the ALJ found "through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equated one of the listed impairments in 20 CFR Part 404, Supbart P, ...." AR 11. The ALJ considered the listings for back and obesity impairments (1.04) and for hip impairments and obesity (1.02).  He determined, however, that Plaintiff did not meet all of the requirements for either listing. AR 11.

At step four, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment. AR 12. The ALJ determined that Plaintiff had past work as a home health aide, but never performed that work at a substantial gainful level. AR 16. He also found that Plaintiff's work as a school cafeteria cook is past relevant work, but that Plaintiff is unable to perform that work. *Id.* Accordingly, the ALJ found that through her date last insured, Plaintiff was unable to perform any past relevant work. AR 16. The ALJ assigned an RFC of a "light work impeded by additional limitations." AR 17. Specifically, the ALJ adopted and gave "great weight" to the RFC assigned by Dr. Entwistle's July 20, 2007 record review. AR 16. The ALJ determined Plaintiff is not capable of her past relevant work. AR 16.

At step five, the ALJ determined Plaintiff is capable of other substantial gainful employment. Specifically, the ALJ determined Plaintiff is capable of performing the requirements of jobs such as (1) tanning salon attendant; and (2) storage rental clerk. As such, the ALJ determined Plaintiff is not "disabled."

### E. The Parties' Positions

The Plaintiff asserts the Commissioner erred in several ways: (1) the Commissioner failed to properly evaluate the medical evidence;[30] (2) the Commissioner failed to properly evaluate Plaintiff's subjective complaints/credibility; (3) the Commissioner relied on vocational testimony which was not based on substantial evidence. The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

### F. Analysis

Plaintiff asserts the ALJ made three mistakes: (1) improperly evaluating the medical evidence; (2) improperly evaluating her subjective complaints/credibility; and (3) relying on vocational testimony which was not based on substantial evidence. These assertions will be examined in turn.

---

[30]This argument contains several sub-parts.

21

### 1.    The ALJ's Evaluation of the Medical Evidence

The Plaintiff assigned four points of error to the ALJ's evaluation of the medical evidence. Each is discussed below:

### The ALJ's failure to consider identified, non-severe medical impairments when determining Plaintiff's RFC

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). At step two of the decision, the ALJ noted Plaintiff's hirsutism, cellulitis, and superficial thrombophlebitis of the lower left leg. He determined that each of these conditions, however, was "non-severe." The ALJ specifically emphasized that because he found these conditions to be "non-severe" they would not be considered for the remainder of his decision. AR 10-11.

The Social Security regulations (20 C.F.R. § 404.1545(a)(1)&(2) and (e) explain how the Commissioner determines a claimant's residual functional capacity (RFC):

> (a) General–
> (1)Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record (See § 404.1546)
> (2) If you have more than one impairment. *We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe,"* as explained in §§ 404.2520(c), 404.1521, and 404.1523, when we assess your residual functional capacity. (See paragraph (e) of this section)
> ***
> (e) Total limiting effects. When you have a severe impairment(s) but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, *we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.* Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of anatomical or physiological or psychological abnormalities considered alone; e.g. someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands of those of light work activity

22

on a sustained basis. In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence, including the information described in § 404.1529(c).

(Emphasis added). The State Agency physician, Dr. Entwistle, noted the Plaintiff's stasis dermatitis is a medically determinable impairment. AR 200. The ALJ gave "great weight" to Dr. Entwistle's opinion. Her treating physician characterized Plaintiff's left leg condition as "chronic" (AR 232), and noted the symptoms as : intermittently red, hardened, itching skin, and open, weeping sores which required treatment with antibiotics AR 162, 168, 210, 232 . Dr. Johnson also recommended Plaintiff should wear compression stockings "whenever possible" and keep her leg elevated "whenever possible" during her outbreaks. AR 168.

"Failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." *Spicer v. Barnhart*, 64 Fed. Appx. 173, 178 (10th Cir. 2003). *See also, Washington v. Shalala*, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal. We note that the ALJ failed to consider the Plaintiff's vision loss in conducting the step-four inquiry. This failure, alone, would be grounds for reversal.").

In light of the ALJ's unequivocal statement that he did not consider Plaintiff's cellulitis (or any of her other non-severe impairments) for any purposes past the step two phase of his analysis, it is clear the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). Because the case will be remanded for further consideration, however, the remainder of Plaintiff's assigned points of error are briefly discussed.

### The ALJ's classification of Plaintiff's impairments as "severe" or "not severe"

Plaintiff asserts the ALJ failed to identify some of her severe impairments. An impairment is defined as "severe" if it "significantly limits . . . physical or mental ability to do basic work activities . . ." 20 C.F.R. § 404.1520(c). Stated another way, "only . . . slight abnormalities that do not significantly limit any basic work activity . . ." are considered non-severe. *Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir. 1987) (*citing Bowen v. Yuckert*, 107 S.Ct. 2287 (1987)). Plaintiff asserts the

23

ALJ erred by failing to identify her left leg condition and her hearing loss as "severe" impairments. In support of her assertion regarding the left leg, Plaintiff cites three possible Listed Impairments (4.11 Chronic Venous Insufficiency of a Lower Extremity; 8.04 Chronic Infections of the Skin; 8.05 Dermatitis). For each of those Listings, the duration requirement of symptoms is three months. Plaintiff emphasizes that in his decision, the ALJ discounted her left leg condition because it was intermittent and "never lasts for 12 continuous months . . ." (AR 11). That, however, is not the standard to quantify whether an impairment is "severe" but rather is the general duration requirement to qualify for disability benefits. 20 C.F.R. § 404.1509. Plaintiff discusses the Listings not to persuade the Court that her left leg condition meets one of the Listed impairments, but to emphasize that the relevant Listings (which, if met entitle a Claimant to an automatic finding of "disabled") require a only a three month duration of symptoms. To dismiss her left leg condition as non-severe, therefore, because it did not persist for twelve months was erroneous. The Court agrees. On remand, the Commissioner should revisit whether Plaintiff's chronic left leg condition "significantly limits [her]. . . physical or mental ability to do basic work activities . . ." 20 C.F.R. § 404.1520(c).

Plaintiff asserts the ALJ also erred by failing to recognize her hearing loss as a severe impairment. Although Plaintiff says she was tested, there are no medical/audiology records in the administrative record to support or quantify her hearing loss. She testified that she "doesn't hear well" (AR 34) but that she did not have any problem hearing the ALJ during the administrative hearing. *Id.* She explained she can hear people if she is looking at them, but has problems hearing people if their back is turned. *Id.* Without more evidence of the nature and extent of Plaintiff's alleged hearing loss, the Court cannot find the ALJ's failure to identify Plaintiff's hearing loss as a "severe" impairment was erroneous.

### The ALJ's evaluation of Dr. Johnson's opinion

Plaintiff asserts the ALJ erred by failing to afford Dr. Johnson's opinion controlling weight. "[A treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified. When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater

weight than any other physician's opinion." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).[31] When the treating physician's conclusions are based in part on subjective complaints which are properly found to be not credible by the ALJ, the ALJ may reject those conclusions upon which the physician based his findings on the subjective complaints. *Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).

The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted). "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." *Id.* Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted). Also, 20 C.F.R. § 404.1527(d) provides the factors to consider  for assigning weight to medical opinions. That regulation provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained

---

[31]Although these cases refer to treating and examining/consulting physicians, the same logic would apply to the weight to be given to the opinions of examining/consulting versus non-examining physicians, which is the situation in this case. See also 20 C.F.R. 404.1527(d) which explains the proper weight to be assigned to all medical opinions contained within the administrative records and the factors to consider when evaluating the appropriate weight to assign to medical opinions whether they be treating, examining, or consulting.

from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that

understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

On December 23, 2008, Dr. Jeffrey Johnson, Plaintiff's treating physician, opined Plaintiff could sit/stand for 30 minutes at a time before having to change positions, sit for a total of 4 hours out of an 8 hour work day, stand for a total of 4 hours out of an 8 hour work day, and carry less than 10 pounds on an occasional basis. AR 227-28. The ALJ acknowledged Dr. Johnson's opinion but assigned it "little weight." AR 15. The ALJ cited four reasons for rejecting Dr. Johnson's opinion: (1) Dr. Johnson did not indicate the time period he was addressing; (2) Dr. Johnson did not indicate which impairments he considered that allegedly limited Plaintiff's work abilities; (3) the determination of disability is one left to the sole determination of the Commissioner; and (4) Dr. Johnson's assessment is not supported by his treatment records of Plaintiff, or any of the examinations or treatment records from other medical sources. AR 15.

The ALJ must "always give good reasons" for the weight afforded to a treating physician's evaluation. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Conclusory reasons for rejecting the treating physician's opinion, however, are insufficient. *Id.* The ALJ may reject a treating physician's opinions outright "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1251 (10th Cir. 2002).

The ALJ's reasons for rejecting Dr. Johnson's opinions in this case are conclusory. First, Dr. Johnson was presented with a form to complete. The form did not ask Dr. Johnson to specify a time frame, so he did not do so. That he did not specify a time frame is irrelevant, however, because the record does not indicate Dr. Johnson treated Plaintiff at any time outside the window between Plaintiffs' alleged date of onset and her date last insured.[32] Second, Dr. Johnson was not asked to specifically link the limitations he assigned with the impairments and/or physical conditions for which he treated the Plaintiff. The ALJ had a duty to recontact the treating physician for clarification of his

---

[32]The first treatment note from Dr. Johnson appears in December, 2005, and the last note is from December, 2008.

opinion, if any was necessary. *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8ᵗʰ Cir. 2002) (ALJ obligated to contact treating physician for "additional evidence or clarification."); 20 C.F.R. § 404.1512(e) (explaining that when the information received from a treating physician is inadequate, the Commissioner will recontact for clarification). Third, Dr. Johnson did not purport to provide an opinion on the ultimate issue of disability but only provided the opinions he was asked to give about Plaintiff's physical limitations (just as did consulting physician, whose opinion the ALJ gave "great weight."). Finally, the Plaintiff treated with Dr. Johnson for a period of approximately three years. He diagnosed her with chronic pain syndrome, left leg cellulitis , and hypothyroidism, among other things (AR 232, 237). Each of those conditions was supported by Dr. Johnson's medical records and diagnostic exams (x-rays, blood tests, etc. *see, e.g.* AR 172, 184, 217, ). Plaintiff's treatment was irregular and infrequent, but she plainly and often explained her refusal to be seen and/or to seek more thorough medical diagnostics was because she could not afford it (AR 162, 165, 167, 174, 175, 206).

A claimant may not be penalized for failing to seek treatment she cannot afford. "It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4ᵗʰ Cir. 1986). *See also* SSR 82-59 (justifiable cause for failure to follow prescribed medical treatment includes inability to pay; *Tome v. Schweiker*, 724 F.2d 711, 714 (8ᵗʰ Cir. 1984) ("[W]e believe that a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be, and in this case is, an independent basis for finding justifiable cause for noncompliance."). The ALJ's assignment of "little weight" to the opinion of Plaintiff's treating physician, while assigning "great weight" to the opinion of a non-examining, non-treating physician is not supported by substantial evidence.

### The evidence considered by the ALJ to determine Plaintiff's RFC

Plaintiff's assigns her final point of error regarding the ALJ's evaluation of the medical evidence to the manner in which he formulated her residual functional capacity (RFC). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of the treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8ᵗʰ Cir. 2000).

The ALJ's formulation of Plaintiff's RFC is found at the first two full paragraphs on AR 16. The ALJ states,

> [t]he claimant's minimal treatment for back pain prior to 2008, coupled with minimal findings at the June 2007 consultative examination, degenerative disc disease in the lumbar spine, obesity, and reports that Celebrex controls her pain in 2008, support a finding that the claimant can lift/carry 20 pounds occasionally, stand/walk 6 hours in an eight hour workday; sit six hours in an eight hour workday; occasional operation of foot controls with the right lower extremity; no climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs, stoop, crouch, kneel and crawl.
>
> There is no evidence of prescription for or use of a cane in the Sioux Valley Clinic treatment notes from 2000 to October 2008 (last treatment visit in Exhibit B2F; B6F;B8F). There are no objective examination of gait disturbance. However, giving the claimant the benefit of the doubt, the undersigned finds that she can walk/stand six hours in an eight hour workday, but occasionally balance with hand held device.

After this formulation, the ALJ cited the State Agency physician (Dr. Entwistle's) RFC Assessment which limited Plaintiff to light work with additional postural limitations (AR 195-202). The ALJ stated "this opinion is given great weight, as it is supported by the above residual functional capacity. However, giving the claimant the benefit of the doubt, the undersigned finds that the above light residual functional capacity best reflects the claimant's work abilities prior to her December 31, 2008 date last insured."

It appears, therefore, that the ALJ formulated his own RFC based on the Plaintiff's consultative exam with the State Agency doctor --Dr. Reiffenberger-- (who did not assign any specific physical restrictions), and then assigned "great weight" to Dr. Entwistle's opinion because it was consistent with his (the ALJ's) own RFC formulation. "An Administrative law judge may not draw on his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). *See also* 20 C.F.R. § 404.1545(a)(3) (indicating the Commissioner will assess RFC based on "all relevant medical and other evidence . . ."). For this reason, the ALJ's RFC formulation is not supported by substantial evidence.

29

### 2.    The Credibility Determination

At the fifth step, the ALJ disregarded portions of the Plaintiff's testimony regarding her physical abilities and her subjective pain complaints. The ALJ accepted opinion of the vocational expert which included the limitations described by the State Agency medical consultants.

Plaintiff's final assignment of error is that the ALJ did not appropriately apply the *Polaski* factors to evaluate Plaintiff's subjective complaints when determining her residual functional capacity. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). If the ALJ's credibility determination is supported by substantial evidence, that the reviewing judge may have decided differently is not justification for reversal. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). The ALJ's credibility finding must only be supported by "minimally articulate reasons for crediting or rejecting evidence of disability" *Id.* This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater*, 68 F.3d 387, 391 (8th Cir. 1995). Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.* The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.* Thus, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir.

2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 1529. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320.   The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider her subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount her testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added).   It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

The ALJ did not cite *Polaski* but he did mention 20 C.F.R. § 404.1529 and indicated he had considered those factors. *See* AR 11. The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when determined Plaintiff's pain complaints "are not credible to the extent they are inconsistent with the residual functional capacity assessment."   The ALJ discussed the impact of the Plaintiff's work history, medical treatment, activities of daily living, medications and their side effects upon the plaintiff's claimed pain symptoms. AR 13-15. The ALJ did not specifically mention *Polaski* or elaborate at all  upon  20 C.F.R. § 404.1529 in making his credibility determination. The ALJ's  specific mention of the above  factors, which are the basis of *Polaski* and 20 C.F.R. § 404.1529, however, is sufficient for the reviewing Court to determine whether the ALJ properly considered all the evidence. "Although specific delineations of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require [the Court] to set aside a finding that is supported by substantial evidence." *Carlson v. Chater*, 74 F.3d 869, 871 (8th Cir. 1996).

While the Court may not have reached the same conclusion, a careful review of the portion of the ALJ's decision which addresses the Plaintiff's credibility and subjective complaints indicates the ALJ properly considered  the record evidence as directed by  of *Polaski* and 20 C.F.R. §

404.1529. Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). In light of this standard, the Court will not disturb the ALJ's credibility evaluation.

### 3.     The ALJ's Hypothetical to the Vocational Expert

Plaintiff's final assignment of error is that the ALJ provided the vocational expert (VE) faulty or incomplete information, resulting in an unreliable conclusion regarding Plaintiff's employability and ultimately, her disability status.

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). However, "[t]his does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects–assuming of course, that the ALJ's findings are supported by substantial evidence." *Onstad v. Shalala*, 999 F.2d 1232, 1234-35 (8th Cir. 1993). The ALJ's hypothetical question to the vocational expert must include all the appropriate impairments, and testimony by a vocational expert constitutes substantial evidence only when based on a proper hypothetical question. *Tucker v. Barnhart,* 363 F.3d 781, 784 (8th Cir. 2004). Jobs which are identified by the vocational expert, therefore, which include unrealistic physical demands included in a flawed hypothetical by the ALJ cannot, therefore, constitute substantial, gainful employment.

### Incorporation of the limitation of "occasionally balancing with a handheld device"

The ALJ incorporated into Plaintiff's RFC the limitation that she would be required to "occasionally balance with a handheld device." AR 11. The hand held device to which the ALJ refers is a cane which Plaintiff indicated was prescribed after her left hip replacement surgery. The ALJ gave Plaintiff "the benefit of the doubt" and found she required the use of the cane on an

occasional basis. AR 16. The ALJ included this limitation in his first (and subsequent) hypothetical to the VE. AR 40. The VE opined that given the limitations as described by the ALJ, the Plaintiff would be capable of performing the jobs of tanning salon attendant and storage rental clerk. AR 41. The VE, however, did not recite the balancing with a handheld device limitation when he repeated the limitations back to the ALJ and quantified the restrictions as "light duty in terms of exertional level and postural limitations, with the exception of occasional limiting on stooping, kneeling, crouching, crawling, *balancing*." (Emphasis added).[33]   Plaintiff asserts the VE's failure to specifically incorporate this limitation renders his opinion unreliable, and therefore not supported by substantial evidence.

SSR 83-10 and 20 C.F.R. § 404.1567(b) clarify that a job classified as "light" duty may nevertheless require frequent standing, walking and carrying. "They require use of arms and hands to grasp and hold and turn objects . . ." SSR 83-10. The effect of an occasional requirement of the use of a cane to balance upon the Plaintiff's ability to perform the jobs of tanning salon attendant and/or storage rental clerk was not clearly and specifically addressed by the VE in this case.

The Commissioner asserts that "[e]ven though the expert did not specifically recite those factors in his answers, the ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account." *Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir. 1991). Because the formulation of the RFC will be reconsidered on other grounds on remand, the ALJ will have the opportunity to clarify the effect of Plaintiff's need for the occasional use of a cane for balancing. The Court need not determine at this time, therefore, whether the VE "overlooked" the requirement for Plaintiff's occasional use of a handheld device.

---

[33]The VE mentioned balancing, but did not specifically address balancing with a cane or handheld device.

33

**Determination of extent of erosion of the occupational pool due to additional
limitations when applying the medical/vocational guidelines**

Plaintiff asserts the ALJ erred because "where an individual's exertional RFC does not
coincide with one of the defined ranges of work and/or that range is narrowed further due to
nonexertional limitations the extent of erosion of the occupational base must be identified in order
to determine the individual's ability to make an adjustment to other work.  Where the extent of the
erosion is not clear vocational testimony will need to be obtained." Plaintiff's Brief, Doc. 14 at p. 42.
(citations omitted).

The Eighth Circuit has explained when the ALJ may rely upon the Medical-Vocational
Guidelines, and when a VE must assist in the disability determination:

> Generally, where the claimant suffers from a nonexertional impairment such as pain, the ALJ
> must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational
> Guidelines.  However, the Guidelines may still be used where the nonexertional impairments
> do not diminish or significantly limit the claimant's residual capacity to perform the full
> range of Guideline-listed activities.  In particular, when a claimant's subjective complaints
> of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the
> Secretary's burden at the fifth step may be met by the use of the Medical-Vocational
> Guidelines.

*Baker v. Barnhart*, 457 F.3d 882, 894 (8th Cir. 2006) (internal punctuation altered, citations omitted).
In this case, the ALJ discredited some of Claimant's subjective complaints, but gave her the "benefit
of the doubt" about others, resulting in an RFC which is less than the full range of light duty work.
The ALJ did, however, use the expertise of a VE to identify occupations which are compatible with
Plaintiff's RFC.

The Plaintiff's real criticism is that the VE did not grasp the full extent of Plaintiff's non-
exertional limitations and apply them to the jobs which he identified as suitable for Plaintiff.  Again,
it is not entirely clear from the transcript whether the VE applied all of the additional limitations as
recited by the ALJ.  This issue need not be decided because the matter can be clarified on remand in
light of the Court's order for reconsideration on other grounds regarding the formulation of the RFC.

## CONCLUSION

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Doc. 12) be GRANTED, and that the Commissioner's denial of benefits be REVERSED and REMANDED for reconsideration.

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this 1st day of February, 2011 .

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _Summa Wright_ Deputy